UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHARKNINJA OPERATING LLC,<br><br>Plaintiff,<br><br>v.<br><br>COMERCIALIZADORA Y ABASTECEDORA MINI PRECIOS, S.A. DE C.V.,<br><br>Defendant. | Civil Action No. |

**COMPLAINT AND JURY DEMAND**

Plaintiff, SharkNinja Operating LLC ("SharkNinja"), by and through its undersigned counsel, complains of the conduct of Defendant Comercializadora y Abastecedora Mini Precios, S.A. de C.V. ("Defendant" or "Mini Precios") and alleges upon information and belief as follows:

## NATURE OF THIS ACTION

1. SharkNinja seeks declaratory, injunctive, and monetary relief for Defendant's breach of contract, trademark infringement under the Lanham Act, 15 U.S.C. § 1051, *et seq.,* as well as related state law claims arising from Defendant's wrongful conduct.

2. This case concerns Defendant's failure to pay amounts due under the parties' Transition Agreement (the "Transition Agreement"), unauthorized resale in violation of the Transition Agreement and the Lanham Act, and abuse of process and common law conversion in connection with the restriction of a Mexican bank account held by SharkNinja's affiliate, SharkNinja México, S. de R.L. de C.V. ("SharkNinja México).

3. Specifically, this action concerns Defendant's failure to pay approximately $4 million USD in outstanding purchase-price obligations, subject to an offset by SharkNinja, for

products supplied by SharkNinja ("SharkNinja Products") to Defendant under the Transition Agreement.

4. In addition, upon information and belief, Defendant continued to sell SharkNinja Products after September 1, 2025, when its contractual right to sell any SharkNinja Products ended, causing additional harm to SharkNinja.

5. Lastly, upon information and belief, Defendant improperly obtained, without notice to SharkNinja México and without holding any liquidated and due claim against it, a precautionary order from a civil court in Mexico City freezing funds of approximately MXN $197,317,181.52 (around $10.5 million USD) held in SharkNinja México's Bank of America México bank accounts, in connection with Defendant's disputed retailer-chargeback demand.

6. Therefore, this action seeks injunctive relief enjoining Defendant from maintaining or pursuing the restriction on SharkNinja México's bank accounts, declaratory relief concerning the parties' competing payment obligations, and monetary relief for Defendant's breaches, trademark infringement, and abuse of process.

## PARTIES

7. Plaintiff SharkNinja Operating LLC is a Delaware limited liability company with its principal place of business in Needham, Massachusetts.

8. Upon information and belief, Comercializadora y Abastecedora Mini Precios, S.A. de C.V. is a *Sociedad Anónima de Capital Variable* under the laws of Mexico, with its principal place of business in Mexico City, Mexico.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this Complaint pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and (b), as these claims arise under the Trademark

Laws of the United States.

10. The Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1332(a), because, upon information and belief, there is complete diversity of citizenship between the parties, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11. This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a).

12. This Court has personal jurisdiction pursuant to Mass. Gen. Laws c. 223A § 3 because Defendant transacted business in the Commonwealth and this District.

13. Venue is proper in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this District.

## FACTS

### *A. SharkNinja's Trademark Usage*

14. The U.S. Patent and Trademark Office ("PTO") has issued several registrations for marks used with household and cleaning products and accessories (hereinafter, the "SharkNinja Marks"). The SharkNinja Marks include, but are not limited to:

| Mark | Registration No. | Registration Date |
|---|---|---|
| SHARK | 4,329,299 | April 30, 2013 |
| SHARK | 2,771,850 | October 7, 2003 |
| SHARK IQ ROBOT | 6,131,311 | August 18, 2020 |
| NINJA | 5,453,690 | April 24, 2018 |

15. The SharkNinja Marks have been in continuous use since at least their respective dates of registration.

16. SharkNinja advertises, distributes, and sells its SharkNinja Products to consumers under the SharkNinja Marks.

17. SharkNinja has also acquired common law rights in the use of the SharkNinja Marks throughout the United States.

18. The federal trademark registrations for the SharkNinja Marks were duly and legally issued, are valid and subsisting, and constitute *prima facie* evidence of the validity of the SharkNinja Marks.

19. SharkNinja has invested a substantial amount of money and has expended significant time and effort in advertising, promoting, and developing the SharkNinja Marks throughout the United States and the world. As a result of such advertising and promotion, SharkNinja has established substantial goodwill and widespread recognition in the SharkNinja Marks, and the marks have become associated exclusively with SharkNinja and its products by both customers and potential customers, as well as the general public at large.

20. To create and maintain such goodwill among its customers, SharkNinja has taken substantial steps to ensure that products bearing the SharkNinja Marks are of the highest quality. As a result, the SharkNinja Marks have become widely known and are recognized throughout the United States and the world as symbols of high-quality products.

21. As a result of, *inter alia*, the care and skill exercised by SharkNinja in the conduct of its business, the high quality of the goods sold under the SharkNinja Marks, and the extensive advertising, sale, and promotion by SharkNinja of its products, the SharkNinja Marks have acquired secondary meaning in the United States and the world, including this District.

***B. The Parties' Agreements***

22. On December 19, 2018, SharkNinja and Defendant entered into a distribution agreement (the "Distribution Agreement"), granting Defendant the non-exclusive right to import, sell, and distribute SharkNinja Products within a defined territory.

23. On February 7, 2025, SharkNinja and Defendant entered into the Transition Agreement, setting forth the terms of the termination of the Distribution Agreement.

24. Under Section 2 of the Transition Agreement, the "termination of the Distribution Agreement shall become effective, and the Distribution Agreement shall be deemed terminated in its entirety, as of the April 1, 2025 (the "Termination Effective Date"), *except* in relation to any of the Unsold Inventory that SharkNinja chooses not to repurchase, which shall continue to be sold by MINI PRECIOS subject to the terms and conditions of the Distribution Agreement, which shall terminate in its entirety as of September 1, 2025 when MINI PRECIOS shall no longer be allowed to sell any Products."

25. Under Section 5(f) of the Transition Agreement: "SHARKNINJA shall net the Resell Price of the accepted Unsold Inventory against the outstanding payable owed by MINI PRECIOS."

26. Section 17 of the Transition Agreement selects Massachusetts law. Section 9 provides that the Agreement's terms are enforceable by injunctive relief and specific enforcement in any court in Massachusetts to prevent or remedy actual or threatened breaches.

***C. Defendant's Improper Conduct***

27. Defendant has failed to pay the outstanding purchase price for SharkNinja Products ordered from and supplied by SharkNinja.

28. On September 9, 2026, SharkNinja demanded payment of the $4,000,000 USD

balance or an acceptable written payment plan within ten business days. Defendant's counsel acknowledged receipt on September 22, 2026, but Defendant did not pay by the September 23, 2026 deadline. SharkNinja renewed its demand on September 28, 2026.

29. As of the date of this Complaint, Defendant has not paid the outstanding balance.

30. Upon information and belief, Defendant continued to sell SharkNinja Products after September 1, 2025.

31. Under Sections 2 and 5(d) of the Transition Agreement, Defendant's limited right to sell remaining inventory ended as of September 1, 2025. Defendant was not contractually authorized to continue selling SharkNinja Products after that date.

32. Defendant continues to advertise and offer SharkNinja Products bearing the SharkNinja Marks through various online marketplaces, including, but not limited to, Mercado Libre, under the seller names "MINIPRECIOS" and "SHARK por MINIPRECIOS."

33. Defendant offers Shark Products through these online marketplaces for purchase by consumers in the United States and delivery into the United States, notwithstanding the termination of Defendant's contractual right to sell those Products.

34. SharkNinja Products intended for resale in Mexico often differ materially from SharkNinja Products authorized for sale in the United States.

35. Defendant's unauthorized use of the SharkNinja Marks in connection with those offerings is likely to cause consumers in the United States to believe that the SharkNinja Products are authorized for sale in the United States and carry the same characteristics, warranty protection, and support as SharkNinja Products sold through SharkNinja's authorized United States distribution channels.

36. Defendant's conduct infringes the SharkNinja Marks and damages SharkNinja's

reputation and goodwill by causing consumers in the United States to attribute any potential product deficiencies to SharkNinja rather than to Defendant's unauthorized distribution.

37. Defendant's actions substantially harm SharkNinja by placing infringing SharkNinja Products into the stream of commerce causing harm in the United States.

38. By supplying products infringing on the SharkNinja Marks for sale, Defendant has caused consumer confusion as to the authenticity, sponsorship, or approval of the products.

39. Defendant's conduct as described herein results in the lessening of sales of genuine SharkNinja Products to the detriment of SharkNinja.

40. As a result of Defendant's actions, SharkNinja is suffering the loss of the enormous goodwill it created in the SharkNinja Marks.

41. SharkNinja's preliminary estimate of additional harm from Defendant's breaches totals approximately $3,736,738 USD, comprising $1,040,088.79 in online sales impact, $1,582,899.21 in supplemental funding to maintain competitive pricing, and $1,113,750 in retail sales impact.

42. On March 31, 2026, Defendant sent SharkNinja a demand letter seeking MXN $197,317,181.52 in alleged "Retailer Adjustments" under Section 7(c) of the Transition Agreement, payable within thirty calendar days after receipt. Defendant subsequently characterized its competing demand as approximately $11 million USD.

43. Under Section 7(c) of the Transition Agreement: "By April 1, 2025, SHARKNINJA shall notify each Retailer (i) that all payments or credits which are or become due on account of Products supplied by MINI PRECIOS shall continue to be paid to MINI PRECIOS (and not SHARKNINJA) as same become payable, through and until all Products supplied by MINI PRECIOS are sold or discontinued; and (ii) that except as to the MP Approved Discounts,

any discounts, promotions, no interest/low interest/deferred interest financing programs, liquidation, discontinuity, returns, recalls, or other actions, that have been initiated solely by SHARKNINJA, (herein, "Retailer Adjustments"), shall be applied to as a debt on SHARKNINJA's account, and not to MINI PRECIOS. Commencing as of April 1, 2025, and during a period of twelve (12) months thereafter, MINI PRECIOS shall promptly notify SHARKNINJA of any Retailer Adjustments assessed against MINI PRECIOS other than MP Approved Discounts, and SHARKNINJA shall reimburse MINI PRECIOS for the amount of any such Retailer Adjustment no later than thirty (30) days from the date in which SHARKNINJA receives notice from MINI PRECIOS of such Retailer debit."

44. The parties' representatives were communicating about their competing payment demands during September and October 2026.

45. Upon information and belief, while those communications were ongoing, Defendant commenced a proceeding in Mexico concerning its payment demand (the "Mexico Action").

46. As of the date of this Complaint, SharkNinja has not been formally or otherwise served in the Mexico Action.

47. SharkNinja disputes that Defendant is entitled to the amount demanded in its March 31, 2026 letter.

48. On October 20, 2026, Bank of America México notified SharkNinja that a scheduled payment from one of its accounts had been canceled for insufficient funds, even though the account held a balance well in excess of that payment.

49. That same day, Bank of America México informed SharkNinja México that there was a hold on the funds in its account as "a result of a request received from the relevant authority,"

and declined to provide any further information.

50. On October 27, 2026, Bank of America México further informed SharkNinja México that the hold was a freeze of funds ordered by a civil court in Mexico City for approximately MXN $197,317,181.52, the same amount Defendant demanded in its March 31, 2026 letter. Upon information and belief, Defendant filed the Mexico Action and obtained that order *ex parte*, without notice to SharkNinja México.

51. Upon information and belief, Defendant initiated the bank-account hold for the ulterior purpose of pressuring SharkNinja to pay Defendant's disputed March 31, 2026 demand, in the same amount, and of frustrating the resolution of the parties' dispute in the Massachusetts forum contemplated by Section 9 of the Transition Agreement, rather than solely to obtain an adjudication of the parties' contractual rights.

52. The restriction initially prevented SharkNinja from using its ordinary operating funds for taxes and threatened its ability to meet payroll and other obligations.

## COUNT I
### Breach of Contract – Nonpayment of SharkNinja Product

53. SharkNinja realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54. Defendant purchased SharkNinja Products on credit from SharkNinja, and approximately $4,000,000 USD of the purchase price remains outstanding, subject to an offset from SharkNinja.

55. SharkNinja supplied and invoiced Defendant for the SharkNinja Products giving rise to that outstanding balance.

56. Defendant has failed to pay the outstanding purchase-price balance despite SharkNinja's demands.

57. The Transition Agreement is a valid and binding contract. Section 5(f) expressly recognizes Defendant's outstanding payable and provides for netting the agreed Resell Price of accepted Unsold Inventory against it. Defendant's failure to pay the remaining amounts owed in accordance with its contractual obligations constitutes a breach of the Transition Agreement.

58. As a direct and proximate result of Defendant's breach, SharkNinja has suffered, and is continuing to suffer, damages, costs, and other losses and has been or will be damaged in an amount to be proven at trial.

**COUNT II**
**Breach of Contract – Unauthorized Resale**

59. SharkNinja realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

60. Defendant was terminated as a SharkNinja distributor as of April 1, 2025.

61. Defendant's limited right to sell inventory not repurchased by SharkNinja was subject to the restrictions in Sections 2, 3(b), and 5(c)–(d) of the Transition Agreement, including restrictions on retailer channels after April 1, 2025 and a complete contractual sales cutoff as of September 1, 2025.

62. As of September 1, 2025, Defendant was no longer authorized to sell SharkNinja Products.

63. Upon information and belief, Defendant sold SharkNinja Products after September 1, 2025.

64. Defendant's sales after September 1, 2025 breached Sections 2 and 5(d) of the Transition Agreement.

65. As a direct and proximate result of Defendant's breach, SharkNinja has suffered and is continuing to suffer damages, costs, and other losses and has been or will be damaged in an

amount to be proven at trial.

**COUNT III**
**Trademark Infringement in Violation of 15 U.S.C. § 1114**

66. SharkNinja realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67. This is a claim for federal trademark infringement under 15 U.S.C. § 1114.

68. The acts of Defendant alleged herein constitute the use in commerce, without the consent of SharkNinja, of a reproduction, counterfeit, copy, or colorable imitation of the SharkNinja Marks in connection with the distribution or sale of goods, which is likely to cause confusion or mistake, or to deceive consumers, and therefore infringes SharkNinja's rights in the SharkNinja Marks, all in violation of the Lanham Act.

69. Defendant's infringing activities are likely to cause, are actually causing, and are willful and intended to cause, confusion, mistake, and deception among members of the trade and general consuming public as to the origin and quality of such products and constitute trademark infringement under 15 U.S.C. § 1114.

70. Defendant's use of the SharkNinja Marks demonstrates an intentional, willful, and malicious intent to trade on the goodwill associated with the SharkNinja Marks, thereby causing immediate, substantial, and irreparable injury to SharkNinja.

71. As a direct and proximate result of Defendant's actions, SharkNinja has been, and continues to be, damaged by Defendant's activities and conduct.

**COUNT IV**
**Declaratory Judgment**

72. SharkNinja realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73. An actual justiciable controversy presently exists concerning Defendant's demand for MXN 197,317,181.52 under Section 7(c) of the Transition Agreement and Defendant's approximately $4,000,000 USD unpaid purchase-price balance.

74. Declaratory relief from this Court will terminate some or all of these disputes and controversies.

75. Pursuant to 28 U.S.C. § 2201 *et seq.*, SharkNinja seeks a declaration that it does not owe Defendant the full amount demanded in the March 31, 2026 letter and that reimbursement under Section 7(c) is limited to qualifying Retailer Adjustments subject to the Transition Agreement's exclusions and notice requirements, together with a determination of the parties' net obligations after applicable credits and offsets.

**COUNT V**
**Abuse of Process**

76. SharkNinja realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77. Upon information and belief, Defendant procured process in the Mexico Action, without notice, freezing funds of approximately MXN $197,317,181.52 held in SharkNinja México's Bank of America México bank accounts, even though Defendant holds no liquidated and due claim against SharkNinja México.

78. Upon information and belief, Defendant obtained and is using that process for the ulterior purpose of pressuring SharkNinja to pay Defendant's disputed March 31, 2026 demand, in the same amount, and of frustrating the resolution of the parties' dispute in the Massachusetts forum contemplated by Section 9 of the Transition Agreement, rather than solely obtaining a determination of contractual rights.

79. As a result of Defendant's misuse of process, more than MXN $174 million in

operating funds of SharkNinja's affiliate, SharkNinja México, have been frozen, SharkNinja's payment operations in Mexico have been disrupted, and SharkNinja has suffered damages in an amount to be proven at trial.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff SharkNinja Operating LLC respectfully requests that the Court enter judgment in its favor and against Defendant Comercializadora y Abastecedora Mini Precios, S.A. de C.V. providing the following relief:

1. For an entry of judgment in favor of SharkNinja and against Defendant on each of SharkNinja's claims for relief alleged in this Complaint;

2. For a determination that Defendant's acts of trademark infringement constitute cases of willful and exceptional infringement;

3. For a declaration resolving Defendant's March 31, 2026 demand for MXN 197,317,181.52, including that SharkNinja does not owe the full amount demanded, and determining the parties' net payment obligations after applicable credits and offsets;

4. For a preliminary and permanent injunction restraining Defendant, its officers, agents, servants, employees, attorneys, and any other persons or entities acting in concert or participation with Defendant, from issuing a hold on any bank account of SharkNinja;

5. Award SharkNinja its damages suffered as a result of Defendant's breaches of the Transition Agreement;

6. Award SharkNinja its damages suffered as a result of Defendant's infringing acts and treble said damages as provided by law pursuant to 15 U.S.C. § 1117;

7. Award SharkNinja Defendant's profits as a result of Defendant's act and treble said damages as provided by law pursuant to 15 U.S.C. § 1117;

8. Award SharkNinja its reasonable attorney's fees in bringing this action as allowed by law;

9. Award SharkNinja pre-judgment and post-judgment interest in the maximum amount allowed under the law;

10. Award SharkNinja the costs incurred in bringing this action; and

11. Grant SharkNinja such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

SharkNinja hereby requests a trial by jury on all causes of action so triable.

Respectfully submitted,

SHARKNINJA OPERATING LLC

By Its Attorneys,

*/s/ Morgan T. Nickerson*

Morgan T. Nickerson, Bar No. 667290
morgan.nickerson@klgates.com

K&L GATES LLP
1 Congress Street
Suite 2900
Boston, Massachusetts 02114-2023
Telephone: +1 617 261 3100
Facsimile: +1 617 261 3175

Dated: October 29, 2026